## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

———————————

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                    No. 1:23-CR-01167-WJ

**ELMER BACA-MARQUEZ**,

      Defendant.

### MEMORANDUM OPINION AND ORDER RESOLVING DEFENDANT'S PSR OBJECTIONS AND SETTING DEFENDANT'S GUIDELINE RANGE

**THIS MATTER** is before the Court following a hearing on April 25, 2024, on Defendant's Objections to the Presentence Report (**Doc. 105**). The hearing was continued on April 29, 2024. Defendant objects to three sentencing enhancements in the PSR. In this Memorandum Opinion and Order, the Court addresses these objections and sets Defendant's guideline range.

### BACKGROUND[1]

On January 25, 2023, Homeland Security Investigations (HSI) agents received information from HSI's El Paso, Texas office identifying two human smuggling stash houses located at 6812 and 6817 Cleghorn Road NW in Albuquerque, New Mexico. **Doc. 94 at 5**. It was reported that Francisco Luna-Marquez, a suspected human smuggling organization leader, rented the two residences. *Id.* It was also reported Defendant Elmer Omar Baca-Marquez assisted Francisco Luna. *Id.* Through their investigation, officers learned that while Francisco Luna was named as the renter for the 6812 and 6817 Cleghorn Residences, Defendant Baca-Marquez paid the rent. *Id.*

During a prior human smuggling investigation on January 2, 2023, a United States Customs

---

[1]These background facts are taken from Special Agent Eric Millard's testimony on April 25, 2024, the undisputed facts in United States Probation's Presentence Investigation Report (**Doc. 94**), and Defendant's Plea Agreement (**Doc. 86**).

and Border Protection officer working at the Paso del Norte Port of Entry in El Paso, Texas searched a cellphone seized from a woman arrested on suspicion of alien smuggling. *Id.* The cellphone had a telephone number for a contact listed as "Elmer Mexico," later determined to be Defendant Baca-Marquez. *Id.* The search further revealed WhatsApp text messages from Francisco Luna to the woman, advising her that he was sending Defendant Baca-Marquez to pick up two illegal aliens from her at a park in Albuquerque. *Id.* Francisco Luna also provided the woman Defendant Baca-Marquez' cellphone number and the address for one of the Cleghorn Road residences. *Id.* These text messages took place on December 25, 2022.

After receiving this information, officers initiated surveillance on both 6812 and 6817 Cleghorn Road. *Id.* During this surveillance, they noticed several vehicles with specialty plates[2] parked in front of the houses, along with box trucks and rental moving trucks like U-Hauls and Penske trucks. According to Agent Millard, moving trucks are commonly used to transport large groups of undocumented noncitizens ("UNCs"), often carrying upwards of 50 UNCs in a single truck.

After surveilling 6812 and 6817 Cleghorn Road for several weeks, officers obtained search warrants for both houses. *Id.* On March 7, 2023, they executed these warrants. At 6812 Cleghorn Road, officers encountered Defendant along with his cousins, Genaro and Kevin Baca-Perez. *Id.* During the search, they discovered a large amount of both foreign and United States currency. Additionally, officers found a Cobra Enterprises 9-millimeter handgun with an obliterated serial number, 49 rounds of 9-mm ammunition, a firearm magazine, notebook ledgers, and about 12 disabled cellphones. The ledgers listed 474 names, addresses, cities, and payment records. *Id.* Officers located the handgun, ammunition, several cellphones, and some cash in a drawer in the

---

[2] According to Agent Millard, the presence of multiple vehicles with specialty plates parked in front of a house is an indicator that the house is being used as a stash house.

back bedroom closest to the bathroom. *Id.* In the same room, officers also located Genaro Baca-Perez's passport. Agent Millard also testified that Francisco Luna's paperwork was scattered throughout the house.

During the search of 6817 Cleghorn Road, officers saw Alex Garcia Ramos and Eduardo Gonzalez-Cabrera running out the backdoor. *Id.* **at 6**. Also in the house was a UNC named Jose Ortiz-Delgado. *Id.* During the search of this house, officers discovered 20 cellphones; air mattresses strewn across the floor with no sheets or blankets; blankets covering the windows; and large amounts of beans and rice in the kitchen. *Id.*

After finishing the search, officers interviewed all six men they encountered at the 6812 and 6817 Cleghorn Road residences. During Genaro Baca-Perez' interview, he admitted that after illegally entering the United States he traveled to Albuquerque to work for his cousin, Defendant Baca-Marquez. *Id.* Genaro explained to officers that he worked as a driver and would transport UNCs from a Walmart or Home Depot Parking lot in Albuquerque to other drivers who would take them to their final destinations. *Id.* Genaro also admitted to making about nine trips with two to three UNCs. *Id.* When asked which bedroom he stayed at in the 6812 Cleghorn Residence, Genaro advised officers that he and his brother Kevin shared the bedroom closest to the kitchen and Defendant Baca-Marquez stayed in the back bedroom closest to the bathroom. *Id.*

Officers also interviewed Genaro's brother, Kevin Baca-Perez, who was found at the 8712 Cleghorn Road residence along with Defendant and Genaro. Kevin admitted that he had left Mexico and arrived at 6812 Cleghorn Road seven days earlier. *Id.* He also confessed to being a driver for the human smuggling organization. *Id.*

Officers then interviewed the three men they encountered at 6817 Cleghorn Road. During Alex Garcia-Ramos' interview, he admitted that he illegally entered the United States one month before officers executed the search warrants. *Id.* Upon arriving in the United States, Mr. Garcia-

Ramos was transported to the 6817 Cleghorn Residence. *Id.* Once there, Garcia-Ramos accepted an offer to work for the human smuggling organization to pay off his smuggling fee. He became the caretaker of the 6817 Cleghorn residence, which involved him taking WhatsApp videos of each of the illegal aliens dropped off there. *Id.* A search of his phone revealed 14 different illegal aliens as they arrived at the stash house, there was also a video of 7 UNCs exiting the house and entering a transport vehicle on March 7, 2023. *Id.* Mr. Garcia-Ramos confirmed that the UNCs were being picked up to be transported to their final destinations, and that this occurred five hours before officers executed the search warrants on the homes. *Id.*

In Eduardo Gonzales-Cabrera's interview, he admitted that he left Ecuador three months earlier enroute to Boston. *Id.* To pay off his smuggling fee, Mr. Gonzales-Cabrera began transporting illegal aliens for the human smuggling organization. *Id.* He admitted to making trips to New York, Los Angeles, California, Houston, Texas, and Florida. *Id.*

Finally, officers interviewed Joel Ortiz-Delgado, who disclosed that after he and three other UNCs illegally entered the United States through a storm drain in El Paso, Kevin Baca-Perez picked them up and transported them in the back of a truck to 6817 Cleghorn Road. *Id.* Mr. Ortiz-Delgado went on to advise that the night before the agents arrived, a group of 6 illegal aliens were transported to Michigan. *Id.* That was Mr. Ortiz-Delgado's intended final destination as well, but he was not allowed to go with the group because he still owed on his smuggling fee. *Id.*

Defendant Baca-Marquez eventually pled guilty to conspiracy to transport and harbor illegal aliens in violation of 18 U.S.C. § 1324(a)(1)(A)(v)(I). **Doc. 86**. In his plea agreement, Defendant admitted that he agreed to harbor and transport undocumented non-citizens at a rental house located at 6817 Cleghorn Road in Albuquerque, New Mexico. *Id.* **at 3–4**. He also confessed that he stayed across the street in 6812 Cleghorn Road, so that he could keep any eye on the residence where he and his co-conspirators agreed to harbor undocumented non-citizens. *Id.* He

stayed across the street at 6812 Cleghorn Road to keep an eye on the residence where he and his co-conspirators agreed to harbor undocumented non-citizens. *Id.* Additionally, Defendant stated that they tracked the UNCs using ledgers that detailed destinations and the amounts paid or owed by each UNC. *Id.*

### DISCUSSION

Defendant objects to **(1)** a nine-level smuggling enhancement under U.S.S.G. § 2L1.1(b)(2)(C) and **(2)** a two-level enhancement under U.S.S.G. § 2L1.1(b)(5)(C). Defendant also argues that he is entitled to a two-level reduction under U.S.S.G. § 3B1.2(b) as well as another two-level reduction under U.S.S.G. § 4C1.1. In this Memorandum Opinion and Order, the Court addresses the Defendant's objections to the Presentence Report ("PSR") and subsequently establishes the Defendant's sentencing guideline range.

### I.     Relevant Law:

U.S.S.G. § 1B1.3(a)(1)(A) provides that the base offense level under the Guidelines, including sentencing enhancements, "shall be determined" based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  In the case of a jointly undertaken criminal activity, the base offense level is also determined based on all reasonably foreseeable acts and omissions of other co-conspirators (charged or uncharged) in furtherance of the jointly undertaken criminal activity, which occurred during the commission of the offense of conviction. § 1B1.3(a)(1)(B). Significantly, a Court cannot hold Defendant responsible at sentencing for the acts of other co-conspirators that occurred before the defendant joined the conspiracy. *See United States v. Mateo Garza*, 541 F.3d 290, 293 (5th Cir. 2008) (finding that only the actions committed *after* the defendant joined the conspiracy could be properly assigned to the defendant for sentencing purposes); *United States v. Figueroa-Labrada*, 720 F.3d 1258, 1265 (10th Cir. 2013) (explaining that proper attribution at sentencing requires the

district court to analyze and make particularized findings about the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole.).

Finally, the United States must prove facts supporting a sentencing enhancement by a preponderance of the evidence. *United States v. Garcia*, 635 F.3d 472, 478 (10th Cir. 2011); *See also United States v. Gambino–Zavala*, 539 F.3d 1221, 1228 (10th Cir.2008). In other words, the United States must present evidence sufficient to persuade the Court that a fact is more likely present than not present. *See United States v. Romero*, 747 F. App'x 717, 720 (10th Cir. 2018) (unpublished) ("A preponderance of the evidence means that the evidence, considered in light of all the facts, proves that something is more likely so than not."); *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012) ("To prove by a preponderance of the evidence means to prove that something is more likely so than not so."); *see also* Tenth Cir. Crim. Pattern Jury Instr. 1.05.1. ⸮

## I.    Smuggling Enhancement:

U.S.S.G. § 2L1.1(b)(2) provides for different enhancements depending on the number of unlawful aliens smuggled, transported, or harbored during the offense: (**A**) a 3-level enhancement if the offense involved 6–24 unlawful aliens; (**B**) a six-level enhancement if the offense involved 25–99 unlawful aliens; and (**C**) a 9-level enhancement if the offense involved more than 100 unlawful aliens.

In the PSR, United States Probation assigned Defendant a nine-level enhancement under this section based on the ledgers found in 6812 Cleghorn Road that list over 474 names on them. **Doc. 94 at 8**. Defendant objects to this nine-level enhancement based on these ledgers, arguing that most of the names on the ledgers are either (1) associated with dates before Defendant's involvement in the conspiracy or (2) lack dates altogether. **Doc. 105 at 5**. In response to Defendant's objection, the United States presented evidence during the April 25, 2024, hearing

establishing that there are at least one hundred names in the ledgers associated with November 2022.

The Court agrees with Defendant. As discussed above, a defendant cannot be held responsible under the guidelines for actions committed in furtherance of a conspiracy before joining it. Thus, the Court cannot hold Defendant responsible for the 100 individuals smuggled in November 2022 unless there is evidence that Defendant was part of the smuggling conspiracy at that time. However, no such evidence exists. According to Agent Millard, officers had no knowledge of any smuggling or harboring activities involving Defendant prior to December 25, 2022.

Based on Agent Millard's testimony, the Court finds that it can hold the Defendant responsible only for actions committed in furtherance of the smuggling conspiracy on or after December 25, 2022. Here, the United States did not present names in the ledgers associated with dates after December 25, 2022. As a result, the ledgers are not relevant to this Court's determination of how many UNCs were involved in Defendant's offense.

Setting the ledgers aside, the Court still finds that a six-level smuggling enhancement is appropriate. *First*, Defendant concedes in his sentencing memorandum that his offense involved the smuggling, transporting and harboring of 10 unlawful aliens. **Doc. 105 at 17**. Defendant arrived at this number by accounting for (1) the discovery of two unlawful aliens who were not coconspirators at the Cleghorn houses when officers executed the search warrants, (2) the surveillance video showing six unlawful aliens leaving 6817 Cleghorn Road five hours before agents arrived, (3) the WhatsApp messages establishing that Defendant picked up two unlawful aliens on December 25, 2022. ***Id.***

*Second*, Defendant is also responsible under the guidelines for the 18 additional UNCs transported by Genaro Baca-Perez. As stated above, relevant conduct includes all reasonably

foreseeable acts and omissions of other coconspirators (charged or uncharged) in furtherance of the jointly undertaken criminal activity, which occurred during the commission of the offense of conviction.

According to Genaro Baca-Perez, he moved to Albuquerque specifically to work for Defendant in the smuggling conspiracy.[3] Genaro Baca-Perez further explained that he transported UNCs for the smuggling conspiracy approximately eight or nine times, with two to three UNCs each time. Thus, Genaro Baca-Perez was responsible for transporting around 18 UNCs all while Defendant was involved in the conspiracy. Given that Genaro Baca-Perez' actions occurred while the Defendant was involved in the conspiracy and considering that it is foreseeable that a co-conspirator in a large-scale smuggling operation would transport UNCs multiple times to further the conspiracy, these actions constitute relevant conduct for sentencing purposes.

In total, this amounts to 28 UNCs smuggled, transported, and/or harbored in furtherance of the conspiracy once Defendant joined the conspiracy. These facts, combined with officers' observations of several U-Haul and Penske trucks – known to carry several UNCs in one trip – arriving and departing from 6812 and 6817 Cleghorn Road make it more likely than not that Defendant's offense involved between 25 and 99 UNCs. Therefore, the Court assigns Defendant a six-level enhancement under § 2L1.1(b)(2).

## II.     Firearm Enhancement:

§ 2L1.1(b)(5)(C) provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels."  In the PSR, United States Probation assigned Defendant this enhancement because officers discovered a 9-millimeter handgun in a drawer in Defendant's

---

[3]"Hearsay statements may be considered at sentencing if they bear some minimal indicia of reliability." *United States v. Martinez*, 649 F. Supp. 3d 1182, 1190 (D.N.M. 2023); *See also United States v. Leib*, 57 F.4th 1122, 1128 (10th Cir. 2023) ("While the due process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information, hearsay statements may be considered at sentencing if they bear some minimal indicia of reliability.").

bedroom in 6812 Cleghorn Road. **Doc. 94 at 8**. Defendant argues that United States Probation incorrectly assigned this enhancement because there is no evidence to indicate that he possessed the gun at any time. **Doc. 105 at 8**.

Possession can be actual or constructive. In this case, neither party contends that the Defendant actually possessed the handgun. Therefore, the issue before the Court is whether the evidence demonstrates, by a preponderance of the evidence (more likely than not), that the Defendant constructively possessed the handgun found in a drawer in the room where he slept.

"[C]onstructive possession exists when a person[,] not in actual possession [,] knowingly has the power and intent at a given time to exercise dominion or control over an object." *United States v. Stepp*, 89 F.4th 826, 832 (10th Cir. 2023) (quoting *United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016)). In cases where a defendant exclusively controls a premises, it is reasonable to infer a defendant's knowledge and intent to control contraband within those premises. *Id.* Conversely, when a defendant jointly occupies the premises, the United States must establish a nexus between the defendant and the contraband. *Id.* (quoting *United States v. Benford*, 875 F.3d 1007, 1015 (10th Cir. 2017)). This "may be proved by circumstantial as well as direct evidence." *Id.*

The Tenth Circuit addressed constructive possession in a jointly occupied apartment in *United States v. Taylor*, 113 F.3d 1136 (10th Cir. 1997). In *Taylor*, officers conducting a search of an apartment found a handgun in a bedroom closet. *Id.* at 1139. In the same bedroom agents found receipts and tickets belonging to the defendant in an entertainment center. *Id.* However, officers arrested another resident of the apartment in the bedroom with the firearm, not the defendant. *Id.* Further, officers found a ticket in another individual's name in that same bedroom. *Id.* The Tenth Circuit ultimately ruled there was insufficient evidence to prove that the Defendant constructively

possessed the handgun in the closet from the mere fact the defendant was one of the bedroom's occupants. *Id.* at 1146.

More recently, in *Stepp*, the Tenth Circuit addressed whether there was sufficient evidence to support Defendant's felon-in-possession conviction, where ammunition was found in a jointly occupied home office space. 89 F.4th at 835. The Tenth Circuit held that there was sufficient evidence to support the defendant's felon-in-possession conviction, reasoning that the ammunition's presence in areas the defendant actively used, alongside his personal belongings, supports a rational inference that he constructively possessed the ammunition. *Id.* In reaching this conclusion, the *Stepp* court highlighted that physical evidence demonstrated the defendant actively used the home and the office space. *Id.* at 834. The office included a monitor, displaying live video from home security cameras, and a custom mouse pad featuring a picture of the defendant and his girlfriend. *Id.* The *Stepp* court acknowledged, however, that "presence alone does not suffice to show constructive possession of a firearm or ammunitions," and therefore looked to what other evidence established a nexus between the defendant and the ammunition found in his home." *Id.* at 833. The *Stepp* Court found that other than mere presence, evidence of the ammunition's presence in area the defendant actively used, alongside his personal belongings, supported a rational inference that the defendant had access to, knowledge of, and intent to control the ammunition. *Id.* at 835.

Turning to the present case, the Court finds that *Taylor,* and not *Stepp,* controls. The facts in the instant case are very similar to the facts in *Taylor.* Here, officers discovered the handgun in a bedroom not in plain sight within a jointly occupied home. Further, the bedroom where officers discovered the handgun contained belongings of multiple people in the residence. Specifically, Francisco Luna's paperwork and Genaro Baca-Perez' passport. Notably, the United States did not provide any evidence that Defendant's belongings were found in the room with the handgun, only

10

that someone's belongings were there. Accordingly, the evidence establishes that Defendant was a mere occupant of the bedroom, which is insufficient to establish that Defendant had access to, knew of, and intended to exercise dominion or control over the handgun. Consequently, the United States failed to establish by a preponderance that Defendant possessed the handgun discovered in 6812 Cleghorn Road.

While there is insufficient evidence to prove that the Defendant personally possessed the firearm at 6812 Cleghorn Road, a two-level enhancement is still warranted. The evidence shows that a co-conspirator possessed a firearm in furtherance of the smuggling conspiracy, and such possession was foreseeable. The handgun was located at 6812 Cleghorn Road, where the Defendant admits he and his co-conspirators lived and oversaw UNCs' movements from 6817 Cleghorn Road. There is no evidence that anyone other than Genaro, Kevin, Defendant, and possibly Francisco Luna, all co-conspirators, lived at 6812 Cleghorn Road. Further, the firearm was found in close proximity to cash and what appear to be burner phones. Finally, it is foreseeable that a co-conspirator would possess a firearm in furtherance of a smuggling conspiracy because as testified to by Agent Millard, smugglers carry firearms to protect their cash and intimidate UNCs, so they do not misbehave, cause problems, or flee. Therefore, a two-level enhancement under § 2L1.1(b)(5)(C) is appropriate.

### III.    Adjustment for Certain Zero-Point Offenders:

Defendant also argues that Probation failed to assign Defendant a two-level reduction under U.S.S.G. § 4C1.1, which applies to defendants in criminal history category I with zero criminal history points. The Court agrees.

Under § 4C1.1., courts must decrease a defendant's offense level by 2 if the defendant is in criminal history category I with zero criminal history points and meets all ten criteria set forth under § 4C1.1(a). One of the criteria outlined in § 4C1.1(a), and the only criteria at issue here, is

that "the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." Although the Court found that the firearm enhancement under § 2L1.1(b)(5)(C) applies to Defendant because a co-conspirator possessed a firearm in furtherance of the smuggling conspiracy and such possession was foreseeable by Defendant, this Court did not make a finding that Defendant personally possessed the firearm in question. Thus, the Court is not required to deny Defendant the benefit of the two-level reduction under § 4C1.1. As pointed out by Defendant, the language of § 4C1.1(a)(7) tracks the safety valve language of 18 U.S.C. § 3553(f)(2) and U.S.S.G § 5C1.2(2). U.S.S.G § 4C1.1(a)(7) requires that "the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." 18 U.S.C. § 3553(f)(2) and U.S.S.G § 5C1.2(2)  require that "the defendant did not . . . possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." Thus, the Court applies § 4C1.1(a)(7) as it applies § 5C1.2(2).

While the Tenth Circuit has not addressed whether § 4C1.1(a)'s language should be interpreted the same as safety-valve language, the Court's approach to interpreting § 4C1.1(a)'s language follows from the "elementary principle of statutory construction that similar language in similar statutes should be interpreted similarly." *Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1308 (10th Cir. 2023). *See* also *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion) ("When Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."); *see also Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (internal quotation marks omitted)). When

evaluating a Defendant's eligibility for safety valve relief under § 5C1.2(2), the Tenth Circuit limited the Court's inquiry to "the defendant's own conduct" and not the conduct of co-conspirators which is relevant under § 2L1.1(b)(5)(c). *See United States v. Pena-Sarabia*, 297 F.3d 983, 989 (10th Cir. 2002) (holding that "a joint criminal actor's firearm possession is not attributable to a defendant for purposes of applying the mandatory minimum safety valve provision of U.S.S.G. § 5C1.2(2)").

Since the United States did not establish by a preponderance of the evidence that Defendant actively or constructively possessed the firearm, and the Court applies § 4C1.1(a)(7) as it applies § 5C1.2(2). Therefore, Defendant is entitled to a two-level reduction under § 4C1.1.

## IV.    Minor Role Adjustment:

Finally, Defendant argues that United States Probation should have assigned him a downward adjustment in his offense level for his minor role in the smuggling conspiracy. A defendant bears the burden of proving by a preponderance of the evidence that he is entitled to a minor role adjustment. *United States v. Mendoza*, 468 F.3d 1256, 1264 (10th Cir. 2006). To establish that he is entitled to a minor role adjustment, Defendant must establish, by a preponderance of the evidence, that his part in the offense renders him significantly less culpable than an average participant. U.S.S.G. 3B1.2 cmt. n.3(A).

The United States Sentencing Guidelines provide a non-exhaustive list of factors for the court to consider in determining whether to apply a minor role adjustment, and if so, the amount of the adjustment. This list—as it appears in the Guidelines—states as follows:

In determining whether to apply a minor-participant adjustment, courts should consider the following non-exhaustive list of factors:

(i)    the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)      the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)      the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)      the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)      the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. n.3(C). While this list is instructive, the Tenth Circuit has highlighted that the crux of the inquiry is a Defendant's relative culpability. *United States v. Nkome*, 987 F.3d 1262, 1273 (10th Cir. 2021) (citing *United States v. Yurek*, 925 F.3d 423, 446 (10th Cir. 2019)).

The Court begins by addressing Defendant's assertion that he is entitled to a minor role adjustment because his cousins, the Baca-Perez brothers, each received minor role adjustments. True, the Baca-Perez brothers received minor role adjustments, but Defendant is not similarly situated. The Baca-Perez brothers both participated in the smuggling conspiracy for less time than Defendant. Additionally, Defendant paid rent for both 6812 and 6817 Cleghorn Road which clearly indicates a significant level of responsibility within the conspiracy, as Luna-Marquez trusted him to handle the rent for the Cleghorn properties. The Baca-Perez brothers never provided such support to the smuggling conspiracy. Further, the Baca-Perez brothers were working in the smuggling conspiracy to pay off a smuggling fee, while there is no evidence that Defendant was working for the organization to pay off a smuggling fee. According to Defendant's sentencing memorandum, Defendant first met Franciso Luna while buying a car and then later went to live at 6812 Cleghorn Road. **Doc. 105 at 4**. Finally, the United States did not object, as it does here, to the minor role adjustments in the Baca-Perez brothers' cases. Considering these facts, the Court

finds that Defendant is not similarly situated with the Baca-Perez brothers and is not entitled to a minor-role adjustment on this basis.

Next, the Court addresses Defendant's argument that he is entitled to a minor-role adjustment because he is substantially less culpable than Francisco Luna and Mr. Gracia-Ramos, the caretaker of 6817 Cleghorn Road. While the Court agrees the Defendant is less culpable than Francisco Luna, it disagrees that Defendant is less culpable than Mr. Garcia-Ramos. Mr. Garcia-Ramos told officers that he was involved in the smuggling conspiracy for only a month, a shorter period of time than Defendant's involvement. Additionally, as with the Baca-Perez brothers, Mr. Garcia-Ramos was working for the smuggling conspiracy to pay off a smuggling fee, which was not the case for Defendant. Thus, the Court identifies only one co-conspirator more culpable than Defendant: Francisco Luna, the leader of the smuggling organization. As the inquiry is whether Defendant is substantially less culpable than the average participant in the conspiracy, the Court finds that a minor role adjustment is not appropriate.

### V.    Guideline Range:

Having addressed the Defendant's objections, the Court finds Defendant's correctly calculated sentencing guideline range is **18–24** months based on an offense level of 15 and a criminal history category of I. The breakdown of Defendant's offense level calculation is as follows:

U.S.S.G. § 2L1.1(a)(3): Base Offense Level **12**

U.S.S.G. § 2L1.1(b)(2)(B): The offense involved the smuggling, transporting, or harboring of 25–99 unlawful aliens. **+ 6**

U.S.S.G. § 2L1.1(b)(5)(C): A dangerous weapon, that being a 9 mm handgun, was possessed by a co-conspirator. **+ 2**

U.S.S.G. § 4C1.1: Adjustment for Certain Zero-Point Offenders. **- 2**

U.S.S.G. § 3E1.1(a): The defendant clearly demonstrated acceptance of responsibility for the offense. **– 2**

U.S.S.G. § 3E1.1(b): Defendant assisted authorities in the investigation or prosecution of Defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. **– 1**

Final Offense Level: **15**

## CONCLUSION

For the reasons outlined in this Memorandum Opinion and Order, the Court **SUSTAINS** Defendant's objection to the nine-level smuggling enhancement, determining a six-level smuggling enhancement is appropriate. The Court further **SUSTAINS** Defendant's objection to Probation's failure to assign Defendant a two-level zero-point offender reduction. The Court, however, **OVERRULES** Defendant's objection to Probation's failure to assign Defendant a minor-role adjustment.


**IT IS SO ORDERED.**


/s/ _____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE